## NEW YORK OYER AND TERMINER.

SEPTEMBER, 1851.

Before EDMONDS, Justice, and two aldermen.

### THE PEOPLE v. MICHAEL MULVEY.

Where a homicide is perpetrated by the use of a dangerous weapon, the question whether the offense is murder or manslaughter depends on the fact of an intention to kill.

When an intention to kill may be formed in order to constitute the offense murder.

How the existence of such intention may be ascertained, and the rules which are to govern the presumption of it from the proven facts of the case.

THE prisoner was indicted for murder. He was an Irishman, and young. He supported his widowed mother, and

The People v. Michael Mulvey.

kept his mistress.   He had a trade, and was industrious.   He drank occasionally and became disorderly.   He was a member of a fire company, which had frequent fights with another company, and distinguished himself in its brawls.

About a year before the homicide in this case he had been stabbed by a discarded girl, and thenceforth carried a pistol about his person.

Between one and two o'clock, one night, he and two companions entered an eating and drinking saloon, which was in the habit of being kept open all night, and called for liquor, and began making a disturbance.

They were ordered out, but refused to go.   The keeper of the saloon, and his clerk (the deceased), attempted to put them out.   In the course of the effort the deceased got the prisoner down upon the floor, but no blows were struck.   The prisoner was allowed to get up, and was pushed out of the door.   The saloon was in a basement room, whence the ascent to the sidewalk was by five or six steps.

When the prisoner had ascended two or three steps, he stopped, turned around, and fired a pistol directly at the deceased, who stood facing him, but inside the saloon, and only a few feet distant, and immediately fled.   He was pursued and caught, and brought back to the saloon, where he was identified by the deceased, and by several others who were present.   The ball from the pistol entered the neck of the deceased in a downward direction, and he died before he could reach the hospital.

Two of the prisoner's girls, and one of his companions, attempted to prove an alibi by testifying that he was with them all the night until nearly three o'clock, but they said that when he left the girls he was under the influence of liquor.

*The Judge* charged the jury that the main question was, whether the offense was murder, or manslaughter in the second degree.   It was murder if perpetrated with a premeditated

design to effect death, but manslaughter if effected by a dangerous weapon without a design to effect death.

Both those expressions are used in our statutes. In defining murder, the language is "premeditated design to effect death." In defining manslaughter, it is simply "design to effect death."

But they doubtless mean the same thing — an intention to kill; for if they do not, and if, as has been contended, "premeditated design" means an intention formed some time before the killing, and demanding an interval of time between the formation and execution of the design, then is a large class of homicides untouched and unpunished by our law, namely, those cases where the intention to kill is formed on the instant, and is executed in, and is the cause of, the fatal act. Such cases, under that construction of the law, would not be murder, for want of premeditation to the design, and would not be manslaughter, because there is present a design to effect death.

Such could hardly be the true intent of the statute, for all experience had shown that in this country, in a large majority of cases, where there is an intention to kill, such intention is formed on the instant, and they must be deemed murder, or they would be no offense whatever. The jury were therefore instructed to inquire whether, at the time the shot was fired, there was a design to effect death then existing in the prisoner's mind; and it was no matter whether the design was formed before he entered the saloon, or before or after the attempt to turn him out was made, or before he began to ascend the steps. It would be enough for the jury to be satisfied that when he fired the pistol he had such a design, and that the firing was in consequence, and in execution of it.

To get at facts is comparatively an easy matter, but to ascertain intention is a far more difficult thing. Where it is not fully and truthfully avowed, it must be inferred by a process of reasoning from proven facts.

In criminal cases, this ascertaining the intention is, in almost all instances, an essential thing, and rules have been

The People v. Michael Mulvey.

adopted to aid in the performance of this task, and the jury must bear them in mind.

One of those rules is that a criminal intention may be presumed from acts which, morally speaking, are susceptible of but one interpretation. Thus, if one knowingly administers poison to another, or discharges loaded arms at him, it would be unwise to demand proof that death or bodily harm was intended. In such case, the facts speak for themselves, and a presumption of a criminal intention is so conformable to reason, that moral conviction and legal proof are in perfect harmony.

The good of society demands, in such case, that the accused account for acts *prima facie* illegal, and, if he fails to do so, the presumption may justly be regarded as conclusive against him.

Another rule is that a sane man is conclusively presumed to intend the natural and probable consequences of his own acts, and therefore an intent to murder may be presumed from the use of a dangerous weapon. This is a rule as old as the Mosaic law, and has always prevailed in the common law which we are administering.

Guided by these rules the jury would determine whether there had been an intention to kill.

The verdict was guilty of murder, with a recommendation to mercy.